*State v. Capture the Dream, LLC*, No. 593-9-16 Wncv (Teachout, J., Jan. 23, 2019).
[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

## STATE OF VERMONT

| | |
|---|---|
| **SUPERIOR COURT** | **CIVIL DIVISION** |
| **Washington Unit** | **Docket No. 593-9-16 Wncv** |

**STATE OF VERMONT**
    **Plaintiff**

    **v.**

**CAPTURE THE DREAM, LLC,**
**ADAM GERHARD, and REGINA FRANZ**
    **Defendants**

### FINDINGS OF FACT and CONCLUSIONS OF LAW

This matter came before the court, Hon. Mary Miles Teachout presiding and sitting with Assistant Judges Miriam Conlon and Otto Trautz, for a court trial on October 25, November 2 and 6, and December 18, 2018. The State claims that Defendants Capture the Dream, LLC, and Adam Gerhard violated the State's consumer protection law. Defendants were entitled to judgment on some of the original claims as a result of prior summary judgment rulings, and Regina Franz is no longer a Defendant. The remaining claim for trial was that the remaining Defendants violated the law by representations made during the course of a Kickstarter campaign in the spring of 2014 to raise money for a digital projector for use at the Randall Drive-In, a small drive-in movie theater in Bethel.[1]

The State was represented by Attorneys Shannon Salembier and Merideth G. Chaudoir. The Defendants Capture the Dream, LLC (CTD) and Adam Gerhard (Gerhard) were represented by Attorney J. Scott Cameron.

The court has considered the evidence and weighed the credibility of all testimony and finds the following facts. Based on the findings of fact and conclusions of law set forth below, the claim has not been proved and judgment will be entered for Defendants.

### Findings of Fact

In 2011, Adam Gerhard was a young man living in New Hampshire who, although he had a day job, had a strong enthusiasm for drive-in movie theaters. For a few years prior, he had spent summer weekends going to various drive-ins throughout New England and had become involved in operating them. He had become acquainted with the Randall Drive-In in Bethel, Vermont in 2007 and was enchanted by it.

---

[1] The Randall Drive-In is now known as the Bethel Drive-In. The court will refer to it exclusively as the Randall Drive-In for the sake of simplicity.

Scott Corse was the owner of the Randall Drive-In. He had grown up in nearby Randolph but by then lived in Shelburne and had had a successful career in electric utilities. He owned several investment properties, including in Randolph and Bethel. The drive-in had been part of his childhood when he grew up in Randolph. It had been started in 1951 on a portion of a farm owned by the Randalls. In the early 1990s, when driving by it, he saw that it was closed, and he purchased it from the Randall Estate. He wanted it as a link to his past and to keep it open for the next generation. As an open-air outdoor drive-in, it was open only in the summer on weekends. He operated it himself for 10–12 years, and then began leasing it to others to operate. In the 2011 season, it had not made any money for several years. It had been operated by the Girard family for a few years.

In 2011, Gerhard befriended the Girards and arranged to operate the projector for them the following year, but early in 2012, he learned that they did not intend to return for the 2012 season. Gerhard contacted Corse and they emailed about Gerhard leasing the theater. Corse specified lease terms and Gerhard accepted those terms, but Corse then did not respond to him for some time. Eventually he declined to lease the drive-in to Gerhard for 2012. He leased it to the Millers for the 2012 season. Gerhard visited the drive-in in 2012 and found the quality of the projection poor. He offered to help the Millers with projection, but his offer was refused.

In March of 2013, Gerhard formed Capture the Dream, LLC (CTD) as a business entity through which he would pursue his interest in operating a drive-in. He emailed with Corse about leasing the Randall, and on April 18, 2013, CTD and Corse executed a lease for one year with CTD having the right to renew for a second year if notice of renewal was given by December 31, 2013. The rent was $500 for the season, payable in September at the end of the season.

Gerhard found the on-site 35 mm projection equipment inoperable, and the screen was damaged. He purchased better 35 mm projection equipment and paid for many repairs, including the damaged screen, in preparation for the 2013 season. In conjunction with opening and operating the Randall in 2013, he took over its Facebook page and created a website. Corse initially helped Gerhard. He let Gerhard stay overnight on weekends when Gerhard was operating the drive-in in vacant rental properties he owned nearby, and he helped Gerhard with logistics of equipment needed for repairing the screen.

At this time, the movie industry was rapidly converting from 35 mm to digital projection, and fewer and fewer movies were becoming available on 35 mm. Specifically, first run movies that attract audiences were not being released on 35 mm. Gerhard wanted to be able to convert to digital projection. He held raffles at the Randall to raise money for a digital projector, and in August he promoted a project on Facebook to do so but was unsuccessful.

He was concerned about the viability of operating the following year if he could

not convert to digital. In the fall of 2013, he asked Corse for an extension of the date for notice of renewal for a second year from 12/31/13 to 2/28/14. The lease called for any amendments to be done by a signed writing. Corse agreed by email but did not send a signed writing to the extension. In the latter months of 2013, Gerhard initiated a Kickstarter campaign to raise $45,000 for a digital projector but was unsuccessful. Thus, he faced the question of whether to renew the lease for one year, 2014, without being able to show digital films and with the availability of 35 mm films drying up.

In January of 2014, Gerhard and Corse emailed about future lease possibilities. Gerhard had offered to buy the Randall. In an email dated January 31, 2014, Corse offered specific terms for either a 2 or 5-year lease. Gerhard was particularly interested in a 5-year lease because he faced needing to get a return on the cost of a digital projector. Then on February 1st, the very next day, Corse emailed that he wanted to let things sit a little.

On February 10, Gerhard emailed Corse with very specific information and proposed terms regarding a 5-year lease. Regina Franz, Gerhard's girlfriend, called Corse to follow up on the 5-year lease proposal but did not reach him and left a voicemail message. On February 15, 2014, Corse left a return voicemail message saying that he had "closed the file" on the proposal. Corse was calling in response to Franz's voicemail about a 5-year lease; he was not specific about the status of his previous offer of a 2-year lease. Corse had previously made his offer of two alternatives (5 and 2 years) in writing in an email; the withdrawal was in a voicemail message and appeared to relate to Franz's voicemail about a 5-year lease. It was reasonable for Gerhard to want more direct communication.

On February 16th, the next day following Corse's voicemail, Gerhard emailed Corse seeking a telephone conversation. The status was that within approximately a two week period, Corse had made a specific offer for either a 5 or 2-year lease, and then reversed himself in a voicemail at least as to the 5-year lease, leaving it unclear whether the 2-year offer was still on the table. It later turned out that between January 31st and February 15th, Corse had become annoyed with Gerhard in general, but Gerhard did not know that.

On February 17, 2014, Corse and Gerhard talked on the telephone. The one thing that is clear is that Corse refused to give a 5-year lease. Otherwise, their testimony is conflicting about what was said during this conversation. The status of the understanding of the two men at the end of this conversation is critical to the State's claim that Gerhard made a misrepresentation to the public.

Corse testified that he had made it clear in the February 17th conversation that he would not lease to CTD or Gerhard again on any terms. Gerhard testified that while Corse refused to give the 5-year lease Gerhard wanted, Corse also said he was known to "mellow over time," and that it was not at all clear that there was no possibility of a lease of any kind. Corse denies saying that he would "mellow over time." There is no testimony that there was any discussion of a 2-year lease.

In evaluating the conflicting testimony about what was said during this conversation and what it was reasonable for each man to understand at its conclusion, the court has considered the following. Corse points to his later June 2 letter to Gerhard in which he states that he made it clear in February that he would not lease to Gerhard, and Corse also testified at trial that he made that clear in February. However, both of these statements are after-the-fact representations about what was said back in February, and both were made at a time when it served Corse's purpose to make such statements. Their credibility is soft to begin with for this reason. Added to that is the fact that at trial, it was clear that Corse harbored a deep anger toward Gerhard. This further calls into question his after-the-fact representations about the content of the February 17th conversation. Finally, the evidence shows that throughout their entire relationship, Corse's communications to Gerhard were not clear, orderly, and informed by consistent goals, but were sporadic, inconsistent, and mercurial. He kept changing his mind. This makes his representations on June 2nd and at trial (5 years later) about what he said in a February 17, 2014 phone call not entirely reliable, and the only basis for Corse's version of the phone call is his own after-the-fact statements.

By contrast, Gerhard's behavior supports his credibility, as his ongoing conduct was consistent with his version of the phone call. Eleven days later, on February 28th, he renewed the lease for the second year. His long-term goals were consistent throughout—to run the Randall showing digital films on an economically sustainable basis—and he was constantly evaluating the economic viability of his options. The court also finds Gerhard's testimony about the conversation more credible because he had more at stake during the conversation, and thus his memory about it was sharper and its effect more poignant. For Gerhard, the conversation was critical to the immediate and long-term future course of his passion to run the Randall Drive-In as the major goal and occupation of his life's activities, whereas for Corse, the Randall was a hobby from which he expected to derive no meaningful income and which he had seldom visited in recent years. The evidence is clear that Gerhard would not have renewed the lease if he did not believe that he had a reasonable prospect of obtaining a lease or other arrangement for a longer term, whereas Corse's representation about the phone call is colored by his subsequent actions and thought.

The court finds credible the testimony of Gerhard that Corse did not make it clear during the February 17th phone call that there was no prospect of Gerhard ever being able to lease the Randall. The court finds it not only credible but reasonable that at the end of the February 17th phone call, Gerhard believed that there was a reasonable probability that Corse would "mellow over time," as he had done in the past and indicated he might, and thus Gerhard retained a reasonable understanding that a future lease of some kind, even if only 2 years, was still a possibility.

A few days later, Gerhard wrote on the Randall Facebook page that he did not have a long-term lease.

On February 28, 2014, Gerhard sent Corse an email exercising renewal of the

lease for the 2014 season. He was unsure if Corse would accept a renewal since Corse had never signed an amendment extending the renewal date, but on March 1, 2014, Corse emailed accepting the renewal for 2014. There had been no resolution of discussions about a follow-up lease for subsequent years. A lease for 2014 was signed in April. The rent for 2014 was $1,000.

As it later turned out, in March of 2014, Corse started talking with the owner of a nearby movie theater about the possibility of leasing the Randall to him in 2015. Corse had not told Gerhard that he had withdrawn his offer of a 2-year lease. He did not tell Gerhard that he was in discussion with someone else. Gerhard still believed that there was an opportunity to negotiate a 2-year lease for after 2014.

The same month, March of 2014, once Gerhard had secured the 2014 season for CTD, he immediately embarked on fundraising to obtain a digital projector as soon as possible. He believed that because of the lack of 35 mm movies, he would not be able to operate past June 18th or so in the 2014 season if he could not show digital films. He opened a Paypal account for CTD to accept donations, organized raffles, and most significantly for this case, he organized a second Kickstarter campaign.

Kickstarter is a means by which "creators" can raise money through contributions from "backers" over the internet to fund creative projects that otherwise might not be able to be funded through standard commercial methods. It is a crowdfunding program that makes available to the public the opportunity to support aspirational projects. Creators contract with Kickstarter to abide by certain terms, one of which is that all contributors are entitled to receive pre-specified concrete "rewards" in exchange for their contributions. In other words, backers are not making a gift or outright donation. Rather, they are making a contribution for which they will receive a return in the form of a "reward." Creators specify the total amount of money they seek for their project. If the total is raised, then the pledges are collected and the creator is obliged to provide the specified rewards; if the total is not raised, then the pledges are not collected.

Even if the money is collected and used by the creator, although the creator is expected to try to achieve the stated goal or objective, results are not guaranteed. A contributor is not entitled to successful achievement of the project. Rather, the backer acquires the opportunity to give financial support to a project he or she considers worthy, but the backer assumes the risk that the project may not succeed, and the contributor will have only the specified "reward" in return. Contributors to Kickstarter accept the potential of failure. Information about the project is posted on the Kickstarter website. In this case, the Randall also had, in addition to the Kickstarter page, a Facebook page where those interested, if they were Facebook users, could also obtain ongoing, real-time information about the project.

CTD's Kickstarter campaign ran from April 11 to May 27 of 2014. The Kickstarter page identified the project as raising money for a digital projector to be used at the Randall Drive-In. It represented that the total cost would be $75,000 but that the Kickstarter campaign goal was for $20,000. CTD is described as a business entity and

the fact that the drive-in was leased is identified. The page includes a link to a video produced by ABC news in which Gerhard is described as the "owner" although it is ambiguous whether he was the owner of the business or the real estate.[2] Reference is made to the 2014 season. The phrase "Go digital or go dark" is featured.

The State characterizes the impression created by the Kickstarter page as a representation that money raised would be used for long-term operation of the Randall Drive-In. Its claim is that Defendants were representing to the communities of Randolph and Bethel that by backing this project, they would be investing in a projector that would stay in the community and keep the drive-in alive for years to come for their benefit. The State attributes to Gerhard the motive of seeking to raise money through this ruse to acquire a projector that he could take with him wherever he chose to go following the 2014 season, since he hadn't secured a lease for any period after 2014. The State called as a witness a person from the community who had contributed to the campaign who testified that she interpreted the information on the Kickstarter page as a statement from someone who had control over the drive-in and its future that the campaign was for a digital projector to be used for years into the future at the Randall Drive-In and not elsewhere, and if the campaign was not successful the drive-in would be closed for good. She testified that this was her interpretation even though she was a person knowledgeable about Kickstarter who had read the terms and conditions related to backing a Kickstarter project and knew the aspirational nature of Kickstarter projects and what a backer was and was not entitled to.

However, the Kickstarter page says, "As long as we join together and at LEAST meet our minimum goal of $20,000, movies will be shown at the Randall Drive-In in 2014 in full digital glory!" The focus of this statement is on 2014. It is true that the page also says, "While all previous challenges have been met, digital cinema now threatens to close down this drive-in for good." This is not inaccurate; the evidence at trial was that half of theaters that could not convert to digital closed for good—the "threat" of closure without a digital projector was real. It is also true that the page includes the following statements: "[W]e are asking for assistance so our company can obtain a digital projector and we can keep running drive-ins for many years into the future . . . we are asking the community to help fund our companies' quest to own a digital projector so we can keep running drive-ins and living our dream." Taking all these statements together, the reasonable interpretation is that if a digital projector could be purchased, digital films would be shown at the Randall through 2014; if not, the reality of the industry is that the Randall may have to close for good; if a digital projector could be purchased, it may be possible to keep a digital drive-in open, at least somewhere, following the 2014 season.

---

[2] In fact, Corse was the owner of the land, which was leased to CTD, which was the owner of the business. Gerhard was and is the sole member of CTD, which is a limited liability company. The court is mindful of the fact that the video was a news story, and that news reportage is not always precisely accurate as to detailed facts. Gerhard was certainly the person in charge of the Randall Drive-In at the time of the ABC news story, and the gist of the story was accurate as to what was happening at the Randall. The court does not find that the posting of the ABC video on the Kickstarter page was a misrepresentation by Gerhard given that it was a representation made by ABC and not Gerhard or CTD, and the accurate information about ownership and the lease was posted directly by them on the Kickstarter page.

A few days into the Kickstarter campaign, someone on the Randall Facebook page asked about the lease of the drive-in. The response posted by Gerhard was that we "plan to run for long-term." This was accurate as to CTD's and Gerhard's "plan," as his strong goal was to be able to operate the Randall, either through ownership or on a lease basis, for a period of years. The court also finds that lease negotiations had not been terminated with certainty such that CTD and Gerhard could have no hope of operating after the 2014 season. Corse had not communicated to Gerhard a withdrawal of his offer for a 2-year lease for the subsequent years. Moreover, he had been mercurial in his negotiations in the past (declining at first and then later agreeing to lease) and had also said that he tended to "mellow over time." All of these factors gave rise to a reasonable assessment on the part of Gerhard that a follow-up lease was still a viable prospect. The drive-in had lost money for several years before Gerhard became involved and, as far as Gerhard knew, there were no potential rival lessees on the horizon. He had had a good season in 2013 and expected to be able to have even more success with a digital projector in 2014 so that he could convince Corse that it would be good for Corse to agree to a new lease, as the drive-in could stay alive and generate increased revenue.

Even given all these facts, as to whether it was misleading to post that we "plan to run for long-term," the question is whether this post reasonably created the impression that the projector would stick with and be used at the Randall Drive-In for a period of years as opposed to being taken somewhere else. Of the 257 Kickstarter backers, it appears that many were motivated to sustain "the drive-in experience" in general: some from far away acknowledged that they were unlikely to ever actually visit the Randall, and others recalled with nostalgia their past Randall experiences which, by joining the Kickstarter campaign, they might rekindle and make available to others.

At some point during the Kickstarter campaign, Corse became aware of it and was upset, apparently at the fact that there had been any mention of lease issues. On May 9, 2014, he emailed Gerhard asking if it was true that Gerhard had suggested that without a digital projector the Randall may have to close.

Sometime around May 26, Corse told the theater owner with whom he was in contact that he did not intend to do further business with Gerhard, but he did not tell Gerhard this. He had still not communicated to Gerhard that the 2-year lease option was off the table.

During the Kickstarter campaign, Gerhard learned of the possibility of less expensive refurbished digital projection equipment becoming available through a company called Scrabble. This was good news as refurbished equipment was hard to find and in demand. He had expected to have to try to raise money for the full price and this could reduce the cost. He followed up.

The Kickstarter campaign ended with 257 backers having pledged $22,000. This was a success and meant he would have the Kickstarter money to put toward a digital projector. Most of the 2014 season was still left.

7

On June 2, 2014, Gerhard received a concrete proposal from Scrabble for a lease–purchase agreement for refurbished equipment, which he accepted on June 16th. He began arranging for the rewards he had offered on the Kickstarter page (T-shirts, mugs, etc., some of which needed to be ordered). He immediately began booking digital films.

On June 5, 2014, Gerhard received a letter from Corse dated June 2, 2014 in which Corse was specific that he was not offering a lease for the period after the 2014 season. Gerhard responded with a letter dated June 14th in which he continued to seek common ground on terms for a new lease.

On June 20th, CTD received $20,067.74 from Kickstarter (not all pledges were paid). He used all this money to pay for Kickstarter rewards and for the down payment on the digital projector. There was some other donation money that he used for necessary related equipment for digital projection. He installed the digital projector on June 23rd.

From then on throughout the 2014 season, he showed digital films at the Randall. He extended the season into October, which was longer than it had previously lasted. The season was successful. By October, he had fulfilled all the obligations for rewards to go to the Kickstarter backers. Even though some had not apparently relied on receiving them, he physically delivered them to many who had not picked them up at the drive-in.

On August 30, 2014, Gerhard had sent Corse a check for payment of the lease fee for the 2014 season, along with a letter in which he again requested to negotiate for a lease beyond 2014. Corse did not open the letter. He had stopped opening any mail from Gerhard. He did not communicate further with Gerhard. He has never cashed the check.

Gerhard realized by this time that the prospects for a lease for the following year were becoming dimmer. He still wanted to lease the Randall for the following year and thereafter, but he also made a public statement, published in the newspaper, that he was willing to transfer the digital projector and rights under the lease–purchase agreement to Corse or anyone who would be operating the Randall after 2014. Corse read about this in the newspaper. He did not contact Gerhard.

On November 24, 2014, Gerhard posted on Facebook that CTD would not be returning to the Randall for the next year's season. Nonetheless, he emailed Corse on December 4th that he was still interested in a 2-year lease starting in 2015. Corse did not respond on that subject, but on December 11th he emailed Gerhard instructing him to remove his equipment from the property. Gerhard removed his equipment, including the digital projector, leaving behind many improvements related to upgraded equipment.

In December, there were two articles in the Herald, the local weekly newspaper, about developments at the Randall. In the second, Corse is quoted as saying that he had not yet decided what he was going to do about the next season.

CTD's lease period ended on December 31, 2014. CTD and Gerhard had fulfilled

all obligations to Corse under the lease and to backers under the terms of the Kickstarter agreement. Although CTD had possession of the digital projector, CTD and Gerhard had a remaining $30,000 obligation under the lease–purchase agreement. There is no evidence that Gerhard was not still willing to transfer the digital projector and its lease–purchase agreement to a subsequent operator of the Randall.

In April of 2015, Corse signed a long-term lease with the movie theater owner, who had the benefit of the repairs and improvements CTD and Gerhard had made and paid for during the 2013 and 2014 seasons, with rent for the first year of $100. The new lessee operated the drive-in during the 2015 season with 35 mm films under the name of the Bethel Drive-In.

In March of 2016, the Attorney General's Office was conducting an investigation into the circumstances of this case. Attorney Cameron, who represented CTD and Gerhard, contacted Corse to discuss the facts. The next day, Corse sent Attorney Cameron an email in which Corse initiated an offer to buy the digital projector "at the heart of the AG's investigation" if Gerhard also agreed to other terms and Corse would "meet with the AG and other interested parties to promote these results as preferable to a trial." Gerhard understood this as Corse believing that he had some influence over the Attorney General's investigation and did not accept this proposal.

The new lessee operated the Bethel Drive-In in the 2016 season with digital films. These films were not shown with Gerhard's digital projector, as no one had taken advantage of Gerhard's offer to have the digital projector he acquired used at the Randall in years after 2014. The State filed this case in September of 2016.

The undersigned factfinders have evaluated the representations made on the Kickstarter page and on Facebook and find that the overall impression left by defendants' communications was not likely to mislead the audience to which it was directed: visitors to the Kickstarter page and internet users on the Randall Facebook page.

A fundamental question is whether consumers were likely to be misled by the emphasis on the Kickstarter page of "Go digital or go dark." This was in fact accurate: at the time of the Kickstarter campaign in the spring of 2014, if CTD had not been able to acquire a digital projector, it would have 'gone dark' about a month later, in June of 2014. Instead, with the digital projector, it was able to operate and even show first-run films from June through October of 2014. If an individual consumer thought that this phrase meant that getting a digital projector would prevent the Randall from shutting down for years, that was due to infusing their own individual assumptions into the phrase, and such infusion is not reasonable to attribute to Kickstarter page viewers generally, even if a few might have done so.[3] If a potential backer was concerned about the meaning of the phrase, there was the opportunity to ask about it on Facebook and get a

---

[3] The State presented evidence from one witness who interpreted the phrase this way, but that does not prove that it is objectively reasonable for the average person to do so. There were 257 Kickstarter backers and others who gave outright donations. The court's responsibility is to consider a reasonable interpretation from an objective perspective rather than based on one person's interpretation.

prompt answer before deciding whether to choose to contribute or not. The Kickstarter audience inherently consists of internet users, many of whom also use Facebook.

More importantly, the nature of the Kickstarter process is important on the issue of whether a consumer is likely to be misled. The Kickstarter audience is global. The presentation on the Kickstarter page was not directed to the Bethel community exclusively, even though that is where the drive-in is located, but to persons worldwide who may be interested in drive-ins. It is inherent in the Kickstarter format that backers may choose to support a project that is not designed to benefit them directly. It is known that of the 257 backers, 121 were from Vermont and at least 63 were from elsewhere or unknown locations. The target consumers of the Kickstarter campaign were Kickstarter readers and not necessarily persons living in the Bethel community.

Furthermore, in becoming a Kickstarter backer, a person reasonably should know that they are not entitled to any particular outcome except the specific reward that they select at the time of making a pledge. They are not entitled to a successful outcome of the project. They are reasonably entitled to rely on the fact that funds raised through Kickstarter will be used to further the project, and that in fact did happen in this case: the Kickstarter money was all used for the digital projector project and enabled the projector to be purchased, the rewards to be provided, and digital films to be shown for four months in 2014. This is what a Kickstarter backer was entitled to expect, and the Kickstarter page clearly identified the fact that CTD was only leasing the drive-in property and only talked about 2014. To the extent that there were implications about future seasons at the Randall, those implications were expressed as aspirational in nature. Gerhard made extensive good faith efforts to pursue those goals.

The undersigned have considered all the communications individually and collectively, keeping in mind that the law calls for consideration not just of individual statements but of the overall impression created in the minds of the consuming public and the legal standards set forth below. As a matter of fact, the undersigned factfinders do not find that the average person—the reasonable consumer—to whom the Kickstarter campaign and related Facebook communications were addressed were likely to be misled by the representations made in those formats, either individually or collectively.

The undersigned further find that it would not be reasonable to interpret the communications on the Kickstarter page to be misleading, and that inferences and assumptions made by readers on the Kickstarter and Facebook pages were not material to the decision to contribute to the Kickstarter campaign because of the nature of Kickstarter and the specific terms on which backers make contributions.

## Conclusions of Law

Vermont's Consumer Protection Act is set forth at 9 V.S.A. §§ 2451–2466c. The law was enacted "to protect the public, and to encourage fair and honest competition." In this suit, the State alleges violations of 9 V.S.A. § 2453(a), which makes it unlawful to

employ "unfair or deceptive acts or practices in commerce," and 9 V.S.A. § 2457, which provides that a violation is a "failure to sell any goods or services in the manner and of the nature advertised or offered, or the refusal or inability to sell any goods or services at the price advertised or offered or in accordance with other terms or conditions of the advertisement or offer."

These prohibited acts have been interpreted by the Vermont Supreme Court to require the result of misleading an ordinary and reasonable consumer into spending money for a product or service. In the instant case, contributions to the Kickstarter campaign, totaling approximately $22,000, are being presented by the State as resulting from deceptive acts of the Defendants. The undersigned have used the legal principles set forth below in analyzing the evidence and determining the facts resulting in the conclusion that the elements of a consumer fraud claim have not been proved.

The bases for the State's claim are statements made or attributed to Defendants that a successful Kickstarter campaign for funds to procure a digital projector would permit continued operation of the Randall Drive-In, without which the Randall would be forced to close due to unavailability of first-run movies in 35 mm format, when Defendants knew or should have known that they would not be permitted to operate the Randall beyond the summer of 2014 and therefore knew that the projector would benefit Defendants and not the community from whom funds were solicited.

> The elements of "a deceptive act or practice" are [as follows:]
>
> (1) there must be a representation, practice, or omission likely to mislead [the] consumer[ ];
>
> (2) the consumer[ ] must be interpreting the message reasonably under the circumstances; and
>
> (3) the misleading effects must be "material," that is, likely to affect [the] consumer['']s conduct or decision with regard to a product.

Deception is measured by an objective standard focusing "on risk of consumer harm" in a particular case. "[A]ctual injury need not be shown" because "representations made [with the] capacity or tendency to deceive" satisfy the standard.

*Peabody v. P.J.'s Auto Village, Inc.,* 153 Vt. 55, 57 (1989) (citations omitted).

---

To be reasonable . . . the consumer's understanding need not be the only one possible; "[i]f an ad conveys more than one meaning to reasonable consumers and one of those meanings is false, that ad may be

condemned." Furthermore, the Act "does not require a showing of intent to mislead, but only an intent to publish the statement challenged."

Materiality is also generally measured by an objective standard, premised on what a reasonable person would regard as important in making a decision; it may include a subjective test, however, where the seller knows that the consumer, because of some peculiarity, is particularly susceptible to an omission or misrepresentation. . . . "Where the seller knew, or should have known, that an ordinary consumer would need omitted information to evaluate the product or service, or that the claim was false, materiality will be presumed because the manufacturer intended the information or omission to have an effect."

*Carter v. Gugliuzzi*, 168 Vt. 48, 56 (1998) (citations omitted).

---

More importantly, the instructions as a whole reflected the proper legal standard on how to assess whether a representation is deceptive because they required the jury to consider the overall impression left by defendants' communications. See *Kraft, Inc. v. FTC*, 970 F.2d 311, 314 (7th Cir.1992) (claim is deceptive if it is likely to mislead reasonable consumers after examining *overall net impression of representation*); *Avis Rent A Car Sys., Inc. v. Hertz Corp*., 782 F.2d 381, 385 (2d Cir.1986) (unfair advertising claim requires fact finder to consider advertisement *in its entirety, like a mosaic, and not in separate pieces*); *FTC v. Sterling Drug, Inc.,* 317 F.2d 669, 674 (2d Cir.1963) (deception must be measured by *ultimate impression advertisement leaves on reader* since consuming public does not normally study or weigh each word in an advertisement).

*Jordan v. Nissan North America, Inc.,* 2004 VT 27, ¶ 8, 176 Vt. 465 (emphasis added).

The State argues that it has proved each of the three necessary elements. Before analyzing each element, it is important to emphasize how this case fundamentally differs from many CPA cases. At issue in this case is not a particular product or service with immutable characteristics about which a seller may have made more or less misleading representations. This case arises out of representations made about a forward-looking project, the acquisition of a digital projector and operation of a drive-in theater. The project was financed in part via Kickstarter. The nature of Kickstarter campaigns, and thus Kickstarter donors' reasonable expectations, is that they are aspirational and the creators, even if fully funded to the extent requested, may not succeed with the ultimate goal. The creator is bound to operate in good faith, but it is not reasonable to assume that the creator's good faith will result in accomplishing the goal of the project. Uncertainty of outcome is an intrinsic characteristic of the endeavor the contributor chooses to participate in. This context informs all elements of the CPA claims in this case.

Keeping the above standards, and the specialized context of this case, in mind, each element is addressed as follows:

Representation or omission likely to mislead.

The State argues that Gerhard knew in February of 2014 that 2014 would be his last season at the Randall because Corse told him so then, and yet in April of 2014, during the Kickstarter campaign, he wrote on Facebook in response to a question about the lease that he planned to keep running for the long term, and that this was a misrepresentation that constituted a deception to the community. This claim rests in large part on a determination of fact that Gerhard knew in February of 2014 that he would not be at the Randall after 2014, and the court has found that not to be a correct fact. The findings of fact show that the credible evidence is that Corse had made an offer to Defendants of either a 5 year or a 2-year lease, and that although he withdrew the offer of a 5-year lease, he never communicated a withdrawal of the offer of a 2-year lease to Defendants until June 5, 2014, which was after Gerhard wrote that he planned to be there long-term.

Moreover, the facts show that Gerhard steadfastly attempted to buy the drive-in or secure a longer term lease, and that his expectation that Corse would, in the end, lease to him was a reasonable one, given Gerhard's experience of Corse's prior behavior of sporadic and changing communications, the objective evidence that Corse did not appear to have any alternative options for keeping the drive-in open, and the well-founded assumption and tenable expectation that long-term viability of the Randall depended on conversion to digital format and Gerhard appeared to be the only one interested and available in making such a conversion. From Gerhard's perspective, leasing to him was the only apparent rational thing for Corse to do. Thus, the evidence does not show that Gerhard or CTD made any misrepresentations or omissions about whether they planned to operate a hoped-for digital projector "long term." It is also important to recognize that any such representations were about future events and predictions about the future are a different sort of representation than those describing past events or the characteristics of a fixed product.

Similarly, the court has not found that the posting of the ABC news story on the Kickstarter page was a misrepresentation that Gerhard or CTD "owned" and controlled the future of the drive-in because it was the news producer's statement and not theirs, and the information on the Kickstarter page was otherwise accurate: CTD was a business entity that operated the drive-in and leased the property on which the drive-in was located. The mischaracterization in the news story was not misleading in effect in the context of the Kickstarter page.

Gerhard's conduct seems relatively reasonable to the extent that he thought he was in an arms length negotiation with a lessor on the other side who would be motivated to make rational business decisions. In fact, it seems instead that this was a hobby for Corse, whose interests weren't to maximize business outcomes but to serve other interests.

Keeping in mind that lack of good faith generally is not a required element, and focusing instead on the required element of whether any representation or omission is "likely to mislead" a consumer, the findings of fact show that the target audience of the Kickstarter campaign and related Facebook communications was not likely to be misled by the representations in those two formats. The standard to be applied is an objective one[4] and applying that standard, the court cannot conclude that the lack of detailed information about the status of lease negotiations for the future was likely to mislead a potential Kickstarter backer. Indeed, many of the backers were not even from the Bethel area, but nonetheless supported the "dream" of drive-in theaters continuing to be available to movie goers on summer nights.

Moreover, it was a campaign that took place in April and May of 2014. The representation as of that date that if the funds were not raised, the drive-in would go dark was real: it would have happened in June and the drive-in would have been dark from June on, at least in 2014, and a reasonable person could conclude that once the drive-in had to close, it may not reopen again.

<u>Reasonable interpretation of the message under the circumstances.</u>

The circumstances about the nature of the message are set forth in the findings of fact: the communications on which the State relies were made on the Kickstarter page and in related Randall Facebook page communications.

The content of the Kickstarter page did not change during the campaign. The court has already found and concluded that the Defendants provided accurate information on the Kickstarter page that CTD was a business entity that operated the drive-in and that it was leased and that the only mention of a time period was 2014. The video clip on the page was clearly the statement of ABC news and any representation about the "owner" was on the one hand ambiguous and on the other, subject to the skepticism that any reasonable person would have about whether all specific details about the ownership of a business would be precisely accurate coming exclusively from a news reporter.

There was nothing on the Kickstarter page that stated that if the digital projector could be purchased through Kickstarter funds, the Randall would continue to be open for years. It is not reasonable for consumers to have felt justified in reaching that conclusion. The most that it was objectively reasonable for a member of the public to interpret from the Kickstarter page is that with a digital projector, the Randall would not have to close right away. No reasonable consumer could have had any reasonable basis to believe that the lessee of the drive-in had any control over the conduct of the lessor as to future lease terms.

---

[4] "Deception is measured by an objective standard focusing 'on risk of consumer harm' in a particular case." *Peabody v. P.J.'s Auto Village, Inc.,* 153 Vt. 55, 57 (1989) (citations omitted).

The circumstances of the Randall Facebook page are a little different in that the form of communication to the public is not a packaged presentation with stable content, but a fluid process of communication involving a number of different people who may come in and out of reading and/or participating in an ongoing conversation over time. It is also not automatic that all backers or potential backers on the Kickstarter page read any or all the entries on the Facebook page. The entry that is the strongest evidence for the State's claim is the question and reply posted on April 14, 2014. Question: "If you only have a one-year lease on the drive-in, when you get the projector (fingers crossed!) does it stay in Randolph or does it go with you?" Reply: "We worked out the lease with the landlord this off season and our plan is to keep running the Randall for the long term."

A reasonable person reading this answer would not be able to tell what "worked out the lease" means. While there is some innuendo that the projector would be at the Randall longer than the 2014 season, the statement is ambiguous. As the findings of fact above show, the statement about CTD and Gerhard's "plan" was accurate. It was his forecast about the future. Gerhard fervently wanted to be able to operate the Randall over a period of years. He had offered both to buy and lease it. He believed that there would still be an opportunity for at least a 2-year lease, given the history and status of his communications with Corse. Given the fluid nature of Facebook communication, if the questioner or any other Facebook reader had found the answer too ambiguous, the opportunity was available to immediately request more specific information. No one did this. The fact that the format permitted a follow-up question to nail down concrete facts is an important feature of the "circumstances" that form the context for the message.

Again, applying the objective standard required by *Peabody*, it was not objectively reasonable for Kickstarter backers (and it can never be known how many Kickstarter backers ever saw this Facebook entry) to have relied on this statement as a representation that a digital projector purchased only in part with Kickstarter funds (keeping in mind that the total cost was represented to be $60,000 (the original full cost before the Scrabble refurbished projector opportunity arose) whereas only $20,000 was requested from backers) that would be owned by CTD as lessee would remain permanently at the Randall.

Misleading representations as material to a consumer's conduct or decision.

The court has previously concluded that the first element—that representations were misleading—has not been met.

Nonetheless, even assuming for the moment that a backer feels subjectively that representations were misleading, as the State's witness apparently did, it cannot be concluded that the statements were material to the decision to donate to the Kickstarter campaign because of the very nature of the Kickstarter program and the specific terms under which a backer agrees to contribute. As previously noted, a Kickstarter backer is not entitled to success of the creator's vision, goal, or project. A Kickstarter backer is entitled in exchange for a contribution to (a) the good faith of the creator in using the

money to seek to accomplish the stated purpose and (b) receipt of the designated reward. These are the factors that are material to the decision to donate. The facts show that both of these outcomes were fulfilled by the Defendants. Moreover, the project succeeded in that months' worth of digital films were shown at the Randall in the summer of 2014 and, without the projector, the Randall would have closed before the end of June, after only about one month of operation. A potential backer in the spring of 2014 could not have counted on, as a material fact, that the projector would stay in use at the Randall over time when it was clear that it would be owned by CTD, which had only a lease on the property. A backer would not even have had a reasonable basis to believe that CTD would be capable of staying in business for years even if it had a longer-term lease.

Again, the very nature and circumstances of Kickstarter have to be considered in determining what is "material" to the decision to be a backer of a project. This is not to say that consumer fraud cannot occur in the context of a Kickstarter campaign. If a so-called "creator" makes up a great-sounding project that he or she never intends to undertake and only does it to convince Kickstarter readers to part with their money so that the person can take it and use it for personal pleasure, then consumer fraud may occur. There, the representations about the project would be "material" to the backer's decision to contribute because the backer would be entitled to believe that the creator was sincere in wanting to do the project. The facts show clearly that, at all times, Gerhard and CTD intended to use the Kickstarter money to show digital films at the Randall drive-in over the long term, and did everything possible to bring that about, and in fact did bring that about for several months—as long as legally permitted to do so. The facts do not show that Gerhard planned or schemed to obtain the projector primarily for his personal benefit, outside of its use at the Randall. He offered publicly to transfer his lease on the projector to anyone who would be operating the Randall after 2014. Although he wound up with the projector, he also wound up with a $30,000 obligation on it.

To the extent it may have been material to some that the projector would be used at the Randall and not elsewhere for years after 2014, Gerhard did everything he could to bring that about. In a Kickstarter project, whether the goal ultimately is achieved cannot be the measure of materiality.

*State v. Capture the Dream, LLC*, No. 593-9-16 Wncv (Teachout, J., Jan. 23, 2019).
[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

Summary:

The key findings of fact, based on application of the law as described above, are that Defendants did not make representations likely to mislead, that it was not objectively reasonable for consumers to interpret the Kickstarter page in a misleading manner, and that in the context of a Kickstarter campaign, any subjective and unreasonable interpretation of the Kickstarter Capture the Dream message was not material to the consumer's decision to become a backer.  Therefore, the elements of a consumer fraud claim have not been proved.

Dated at Montpelier this _____ day of January 2019.


———————————————————
Honorable Mary Miles Teachout
Superior Court Judge


———————————————————
Honorable Miriam Conlon
Assistant Judge


———————————————————
Honorable Otto Trautz
Assistant Judge